IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _____ –Civ– _____ **00 - 4518**

**CIV-MOORE**

MIAMI SPRINGS POWER BOAT CLUB, INC.;
and PAUL J. SLAYDEN,

MAGISTRATE JUDGE
O'SULLIVAN

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA;
THE UNITED STATES DEPARTMENT OF THE
INTERIOR; THE SECRETARY OF THE INTERIOR;
THE NATIONAL PARK SERVICE; THE DIRECTOR
OF THE NATIONAL PARK SERVICE; THE STATE
OF FLORIDA; THE FLORIDA BOARD OF TRUSTEES
OF THE INTERNAL IMPROVEMENT TRUST FUND;
and THE GOVERNOR OF THE STATE OF FLORIDA,

Defendants.
_____/



### COMPLAINT

Plaintiffs, pursuant to Fed.R.Civ.P. 65 and the other laws of the United States set forth in

herein below, for their claims for relief against the Defendants, allege and state:

### I. INTRODUCTION

This is an action brought by residents and owners of two houses located in "Stiltsville,"

Florida who are each named lessees on certain "Campsite Leases" granted to them by the State of

Florida. Plaintiffs seek injunctive, mandamus and declaratory relief, and alternative relief in the

form of damages, for the protection of their Campsite Leases and the stilted structures they have

erected under those Campsite Leases which were set to expire on July 1, 1999 (but which date in

effect has been extended through November 30, 2000 by that certain Standstill Agreement dated

June 29, 1999 and Extension of Standstill Agreement dated November 22, 1999, copies of which

are collectively attached as Exhibit "1"[1]), in an effort to preserve the historical and cultural significance of the "Stiltsville" presence in southeast Florida and Biscayne Bay.

The essence of Stiltsville is set forth in the following quote: "[Miami is] a young city, without much history as compared to many other nations around the world. That which we have must be honored. Those homes [in Stiltsville] are a quiet monument to days of yore, to a peaceful community which enjoyed their environment, and worked hard at creating the foundation of which is our magic city today." *See* Letter to Gail B. Baldwin from Elena V. Carpenter, Publisher, dated July 29, 1998, a copy of which is attached as Exhibit "2." Simply stated, "Stiltsville has tremendous historic and cultural value for [the Miami] area." *See* Letters of the Honorable Ileana Ros-Letinen, Lincoln Diaz-Balart, Carrie Meek, Alcee Hastings and E. Clay Shaw, Jr., Members of Congress to Robert Stanton and Marilyn Harper dated April 15, 1999, attached as Exhibit "3."

## II. PARTIES; JURISDICTION AND VENUE

1.      Plaintiff MIAMI SPRINGS POWER BOAT CLUB, INC. ("Boat Club") is a Florida corporation with its principal place of business in "Stiltsville," Biscayne Bay, Miami-Dade County, Florida, all within the Southern District of Florida.  Plaintiff Boat Club is the current lessee of Campsite Lease No. 2173A dated May 1, 1976, in Biscayne Bay, Florida.  Boat Club's members use and are committed to protecting the cultural and historical values and significance of the house on stilts located on Campsite Lease No. 2173A.

2.      Plaintiff PAUL J. SLAYDEN ("Slayden") is an individual presently residing in Miami, Florida, all within the Southern District of Florida.  Plaintiff Slaydon is one of the original

---

[1] Due to the number of exhibits submitted with this Complaint, Plaintiffs have submitted a separate APPENDIX I containing the exhibits.

2

named lessees of "Campsite Lease" No. 2157A dated May 1, 1976 in Biscayne Bay, Florida. Slayden (along with Evelyn Harden and her son William Lee Harden)[2] uses and is committed to protecting the cultural and historical values and significance of the house on stilts located on Campsite Lease No. 2157A.

3.      Defendant UNITED STATES OF AMERICA ("USA") is a governmental entity present in the Southern District of Florida and the title owner of the submerged land which is a subject of this action.

4.      Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("DOI") is a department, agency or arm of the USA with a presence in the Southern District of Florida, charged with the duty of overseeing the management of the Biscayne National Park.

5.      Defendant SECRETARY OF THE INTERIOR (the "Secretary"), Hon. Bruce Babbitt, is responsible for directing and overseeing all of the actions of the DOI.

6.      Defendant NATIONAL PARK SERVICE (the "NPS") is a division of the Department which currently manages the "Campsite Leases" sued upon in this case.

7.      Defendant DIRECTOR OF THE NATIONAL PARK SERVICE (the "Director"), Mr. Robert Stanton, is responsible for directing and overseeing all of the actions of the NPS.

---

[2]   Evelyn Harden is the surviving spouse of James Harden, deceased, another one of the originally-named lessees on Campsite Lease No. 2157A. Mrs. Harden, as evidenced by Exhibit "44," below, appears to be the designated recipient of official notices from the USA and/or the NPS which concern Campsite Lease No. 2157A, and to the extent necessary, Mrs. Harden is willing to be included in this action as a party plaintiff with respect to said Campsite Lease.

8.      Defendant STATE OF FLORIDA is a sovereign state within the USA which dedicated to the USA, subject to certain reservations and conditions and possible reversion to the State, the real property which is the subject of this action.

9.      Defendant Florida Board of Trustees of the Internal Improvement Trust Fund (the "Florida Trust Fund") is an entity established by 18 Fla. Stat. §§ 253.01 *et seq.*, currently comprised of seven members of Florida governance: the Governor, the Secretary of State, the Attorney General, the Comptroller, the Treasurer, the Commissioner of Education and the Commissioner of Agriculture, and charged with the power to transfer property located in submerged tidal lands subject to the restrictions and reservations of Florida law.

10.     Defendant GOVERNOR OF THE STATE OF FLORIDA, Hon. Jeb Bush, is responsible for directing and overseeing the actions of the State of Florida.

11.     This Court's jurisdiction is grounded in 28 U.S.C. § 1331 by virtue of the Act creating and governing the Biscayne National Park, 16 U.S.C. §§ 410gg–1 *et seq.*, the National Historical Preservation Act, 16 U.S.C. §§ 470 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, the Administrative Procedures Act, 5 U.S.C. §§ 500 *et seq.* ("APA"), and the National Environmental Policy Act of 1969 ("NEPA") and regulations promulgated in accordance therewith, such as 16 C.F.R. § 1.82. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1)-(3).

## II. **PERTINENT FACTS COMMON TO ALL CLAIMS**

12.    Beginning on or about May 1, 1976, the Florida Trust Fund granted Campsite Leases to the Plaintiffs on submerged tidal lands lying situate in Biscayne Bay, Florida. *See* the two Campsite Leases attached hereto as Exhibit "4."[3]

13.    Prior to entering into these Campsite Leases, Plaintiffs had constructed and/or maintained, and thereafter continued to maintain, stilted, stand-alone structures on pilings above the coral shoals and flats near the middle of Biscayne Bay, off the southwest coast of Key Biscayne in Dade County, Florida.

14.    These Campsite Leases each contain a termination provision which causes them to terminate on July 1, 1999, unless otherwise mutually agreed to. *See* Campsite Leases, Exhibit "4" at ¶ 18.

15.    On October 18, 1968, Congress initially created Biscayne National Monument. Public Law 90-606, 16 U.S.C. §§ 450qq, *et seq.* Biscayne National Monument did not include the area in which Stiltsville is located.

16.    Section 3 of Public Law 90-606 provided, *inter alia*, for the donation of property owned by the State of Florida: "[L]ands and interests owned by the State of Florida or Dade County may be acquired solely by donation . . . ." A copy of Public Law 90-606 is attached hereto as Exhibit "5."

---

[3] Five other Campsite Leases still exist in Stiltsville as of the time this lawsuit was filed.

17.     On June 28, 1980, Congress created Biscayne National Park.  Public Law 96-287, 16 U.S.C. § 410gg, 410gg-1 through 410gg-4.  Biscayne National Park was expanded beyond Biscayne National Monument and within the park's boundary was Stiltsville.

18.     Section 102(a) of this Act included a requirement that once again the State of Florida must donate any land it owned.  However, this time Congress imposed additional restrictions, making the State of Florida's donated land *subject to restrictions and reservations existing under Florida law*: "Within the boundary of the park the Secretary is authorized to acquire lands, waters, and interests therein by donation, purchase with donated or appropriated funds, or exchange, except that property owned by the State of Florida or any political subdivision thereof may be acquired only by donation, and subject to such reservations and restrictions as may be provided by Florida law."  A copy of Pub. Law 96-287 is attached as Exhibit "6."

19.     In January 1983 the NPS completed its General Management Plan, Development Concept Plan, Wilderness Study and Environmental Assessment for Biscayne National Park (the "Management Plan").  In the summary at page iii of the Management Plan, the purpose of this Plan is stated as to "preserve the existing natural and cultural features of the park."  A copy of page iii of the Management Plan is attached as Exhibit "7."  In addition, "[t]he objective for managing the bay is to allow *established recreational* and commercial *activities to continue* with controls necessary to guarantee the protection of marine species, water quality, bay-bottom communities and visitor safety."  Management Plan at page 13, a copy of which is included in Exhibit "7" (emphasis added).

20.     With respect to Stiltsville, the "General Development" table at page 33 of the Management Plan states: "Manage existing leases until 1999 upon transfer from state, then remove all man-made structures as stated in the leases."  At page 31 the NPS provides its description of

6

Stiltsville as follows: "When the state of Florida transfers title to the submerged lands, the National NPS will assume responsibility for managing the nonrenewable leases for the 15 privately owned structures in Stiltsville.[4] No additional development will occur. As stated in the leases, when they expire in 1999 all man-made structures will be removed."  Similar statements are made about Stiltsville in the discussion of the NPS' primary proposal for the park at page 69 of the Management Plan. In alternatives 1 and 2 the NPS simply states: "The leases for the residences at Stiltsville would continue through 1999." *See* pages 72 and 75. In alternative 3 the NPS states: "The Stiltsville development would be removed after expiration of the leases in 1999." *See* page 76. In alternative 4 the NPS states: "The National NPS would manage the nonrenewable state leases for the Stiltsville residences until 1999; adaptive cases would be studied at that time." *See* page 79. Copies of pages 31, 33, 69, 72, 75, 76, 79 and 80-81 (the latter pages being a summary of the proposal and four alternatives) of the Management Plan are included in Exhibit "8."

21.    No adverse environmental impacts from Stiltsville are identified or addressed in the body of the Management Plan. With respect to the primary proposal, the summary at page iv of the Management Plan states: "The current proposal is not expected to cause any significant environmental consequences." In Table 7 (pages 86-96), "Consequences Specific to the Proposal and Each Alternative," there are two minor, non-consequential references to Stiltsville. First, at page 89, under the Proposal, with respect to Stiltsville it states: "With continued occupation of Stiltsville, these would continue to be a *potential* threat to bay water quality from *accidental* sewage discharges." (Emphasis added.) The only discussion of water pollution occurs at pages 37 and 54

---

[4] In 1992 Hurricane Andrew reduced to seven the number of structures in Stiltsville.

of the Management Plan, in which the NPS identifies water pollution waste disposal from *boaters*, but not from Stiltsville: "Water pollution from recreational and commercial boat use will be controlled by educating boaters about proper waste disposal, boating ethics . . . ." Management Plan at 37. There is no mention of stopping boating due to the boaters' waste disposal. Second, at page 94, under Proposal the reference to Stiltsville is: "Stiltsville would remain as a visual intrusion in the bay until 1999." Copies of Table 7 and pp. *iv*, 37, 54 and 86-96 of the Management Plan are included in attached Exhibit "9."

22.    In a memorandum to Katherine Stevenson, Federal Preservation Officer and Associate Director, Cultural Resource Stewardship and Partnership for the NPS, dated December 28, 1998, the acting Superintendent of Biscayne National Park references the Management Plan and states: "The final decision as to which course of action will be taken [concerning Biscayne National Park] has not been made, and is currently being reviewed by park management." A copy of said memorandum is attached as Exhibit "10."

23.    By Dedication No. 26383 (3365-13) made December 4, 1979 and signed December 13, 1985, the Florida Trust Fund (Board of Trustees of the Internal Improvement Trust Fund of the State of Florida) ("Dedication") dedicated and conveyed a tract of land consisting of three parcels which included the submerged tidal lands upon which Stiltsville is situated to the USA for the Biscayne National Park. A copy of the Dedication is attached as Exhibit "11."

24.    The Dedication was made "for the accomplishment and purposes of said Public Law 96-287." Dedication at page 3. In making this Dedication, the Florida Trust Fund explicitly stated: "It is understood that the National NPS will take steps to supervise, manage, *protect, and preserve* the natural, *cultural, and historical features* for the use and enjoyment of present *and future*

8

*generations....*" *See* Exhibit "11," Fourth Recitation Paragraph of Dedication at page 1 (emphasis added).

25.    The Florida Trust Fund made the Dedication subject to certain conditions, including *inter alia*:

> 4.  Transfers of interest shall be subject to outstanding easements, reservations, or other interests appearing of record.
>
>         *     *     *     *
>
> 6.  Should land within the park *cease to be utilized* for the purposes of inclusion in the Biscayne National Park or *for preservation purposes*, title to said parcels will automatically revert to the Board of Trustees of the Internal Improvement Trust Fund.

*See* Exhibit "11" (Dedication) at page 3 (emphasis added).

26.    The NPS' management interest does <u>not</u> provide it with the power or authority to evict Plaintiffs from their Campsite Leases or from their current occupation of the stilted structures existing in Biscayne Bay; there has never been produced any actual assignment of the Campsite Leases from the State of Florida to the USA.

27.    In 1986 Florida enacted the Florida Historical Resources Act, 18 Fla. Stat. §§ 267.011, *et seq.* Among other things, the Florida Historical Resources Act requires that "[e]ach state agency of the executive branch . . . shall . . . consider the effect of the undertaking on any historic property that is included in, *or eligible for inclusion in,* the National Register of Historic Places." *Id.* § 267.061(2)(a) (emphasis added). Furthermore, "[e]ach state agency of the executive branch shall initiate measures in consultation with the division to assure that where, as a result of state action or assistance carried out by such agency, *a historic property* is to be demolished or substantially altered in a way which adversely affects the character, form, integrity, or other qualities

9

which contribute to historical, architectural, or archaeological value of the property, timely steps are taken to determine that no feasible and prudent alternative to the proposed demolition or alteration exists . . . ." *Id.* at § 267.061(2)(b) (emphasis added).

28.     The Florida National Register Review Board notified some, if not all, of the lessees that on August 28, 1998 the Stiltsville Campsite Lease sites had been recommended for nomination for inclusion in the National Register of Historic Places. *See, e.g.,* Letters covering Plaintiff Boat Club's Lease, attached as Exhibit "12."

29.     On December 22, 1998, the Florida Department of State, Division of Historical Resources, submitted to Ms. Katherine Stevenson, NPS Associate Director, Cultural Resource Stewardship and Partnership, a National Registration nomination for the "Stiltsville Historic District located in Biscayne National Park" for inclusion in the National Register of Historic Places. A copy of the transmittal letter is attached as Exhibit "13."

30.     Richard Frost, Superintendent of Biscayne National Park at the time, on more than one occasion encouraged the Stiltsville owners to seek historic designation for Stiltsville because that would enable Superintendent Frost to issue a special use permit to allow Stiltsville to remain in place for as long as ten years per permit. On November 5, 1998, the nomination to include Stiltsville in the National Register of Historic Places was again discussed with Superintendent Frost. At that meeting Superintendent Frost said that the NPS would not make a recommendation for or against such a nomination. *See* Affidavit of Thomas J. Caldwell, attached hereto as Exhibit "14."

31.     In the December 28, 1998 letter to Ms. Stevenson of the NPS, the acting Superintendent of Biscayne National Park wrote:

10

In 1997, historians and historical architects from the Southeast Regional Office inventoried the park's historic structures and prepared the List of Classified Structures (LCS). The structures at Stiltsville were considered, but not included on the LCS.

In 1998, the owners of the Stiltsville houses asked if they could prepare a nomination of the Stiltsville District for Listing on the National Register. The park had no objection, and welcomed the formal review of Stiltsville. The park welcomes a review of the nomination by the National Register. *The subsequent determination by the Keeper of the Register will be one of the factors considered in the decision making process for management of the park's resources.*

Exhibit "10" at pages 2-3. A copy of this letter was sent to "Marilyn Harper, National Register." Ms. Harper is the historian who subsequently set forth the reasons why the nomination was rejected. *See* ¶ 39 *infra.*

32.     Contrary to Superintendent Frost's assurances, however, the NPS recommended to the Keeper of the National Register ("KNR") that it deny Stiltsville's nomination, and this adverse recommendation formed the basis of KNR's denial of that application.

33.     By letter dated January 29, 1999, the Chief, Cultural Resource Stewardship for the NPS' Southeast Regional Office wrote a letter to Ms. Stevenson, stating: "although the park has not taken a position on the merits of this nomination, we believe that the nomination should be forwarded to the Keeper *with a recommendation that it not be approved* . . . ." (Emphasis added.) The reasons given were: (1) "[t]he nomination's historic context fails to identify historically significant activities that occurred in or around these seven houses from 1960 to 1965"; (2) "[t]he claim for exceptional significance under Criterion C, based on unique architectural and engineering features, is not adequately supported" and "[i]t is unclear how many of the adaptions to Stiltsville environment are unique . . ."; and (3) since previous houses had been destroyed, "[t]he loss of all but

11

seven of those houses raises serious concerns about integrity of setting, feeling, and association that are not addressed in the nomination." The letter then states: "In the final analysis, this proposed district does not appear to meet the criteria for listing in the National Register." A copy of this letter is attached as Exhibit "15."

34.    In the same January 29, 1999 letter, the NPS' Southeast Regional Office casts aspersions with respect to the sincerity of the nomination *which was encouraged by the Superintendent of Biscayne National Park and which was made by the State of Florida*: "This may be an instance where the National Register process is being used primarily to bolster the case for an extension of leases that are due to expire in July of this year. Considered solely on its merits under a reasonable application of the National Register criteria, this nomination has little to recommend it." *See* Exhibit "15" at page 2.

35.    Yet, in the year 2000, the NPS again suggested that the State of Florida and the Stiltsville owners submit another nomination for inclusion of Stiltsville for listing in the National Register of Historic Places. Indeed, the NPS even *implies that this time the nomination "would be fully considered." See* Witness Statement (dated May 23, 2000) of Denis P. Galvin, Deputy Director, NPS, DOI, Before the Subcommittee on National Parks and Public Lands of the Committee on Resources, United States House of Representatives, concerning H.R. 3033, To Direct the Secretary to Make Certain Adjustments to the Boundaries of Biscayne National Park in the State of Florida ("NPS Deputy Director Witness Statement", a copy of which is attached as Exhibit "16") at 2-3:

> In March, the National Park Service sent a letter to the Florida
> Division of Historical Resources advising that office that we are open
> to considering a new nomination of the Stiltsville structures for listing

12

on the National Register of Historic Places. The new nomination would not necessarily result in a listing, but it would be fully considered. In conjunction with the letter, we let Representative Ros-Lehtinen know that we would be willing to extend the standstill agreement with the Stiltsville owners until March 29, 2002 – two years beyond the date of the letter – in order to provide time for the preparation and review of a new nomination.

36.     However, in that same NPS Southeast Regional Office January 29, 1999 letter, the NPS' Southeast Regional Office admits that Stiltsville is an "admittedly interesting area." *See* Exhibit "15" at page 1.

37.     By memorandum to the KNR dated February 19, 1999, Ms. Stevenson, NPS Associate Director, Cultural Resource Stewardship and Partnerships, directed: "I do not find that the property meets criteria for National Register eligibility." A copy of said memorandum is attached as Exhibit "17." Upon information and belief, in the NPS hierarchy, Ms. Stevenson is in a managerial position above the KNR.

38.     Further evidence of Ms. Stevenson's undue and improper influence on the KNR is found in said memorandum: "Please note that the park would appreciate any information you can provide about the schedule for your decision. Leases in effect at Stiltsville expire on July 1, 1999, and the park is considering various planning alternatives for this area after that date."

39.     Reasons given by Ms. Stevenson for recommending *against* inclusion of Stiltsville in the National Register of Historic Places include: (1) "the proposed period of significance for the district is limited to 1960 to 1965," (2) "the district needs to possess 'exceptional importance' to be eligible for Register listing . . . [and i]t is unclear how many of the adaptions to the Stiltsville environment are unique, and how many are common to other houses built on stilts in hurricane-prone coastal areas," (3) "[b]ecause the proposed period of significance begins in 1960, the nomination's

13

discussion of the community's place in the history of tourism and recreation before that date is of limited usefulness," and (4) how the hurricanes resulted in "the surviving community [being] significantly less dense than the community of 1960-65" and "[h]ow have the sightlines and vistas been affected by the losses of structures?" *See* National Register of Historic Places Continuation Sheet attached to Ms. Stevenson's memorandum dated February 19, 1999 in Exhibit "17."

    40.    On or about March 18, 1999, the KNR denied the State of Florida's application for Stiltsville, giving as its reasons for such denial:

    a)    The Stiltsville structures are less than 50 years in age; *and*

    b)    The Stiltsville community does not make a case for "exceptional importance" required for eligibility under Criterion Consideration G, in that—

    (i)    there is no connection between the existing Stiltsville structures and Stiltsville's previous years as a "hot spot;"

    (ii)    many design elements on Stiltsville constructions were required by building codes adopted after 1965;

    (iii)    it is not clear what "original fabric" of Stiltsville survived Hurricane Andrew in 1992; and

    (iv)    the relationship of the seven remaining Stiltsville structures is tenuous and not a "community" as it once was.

*See* Reviewer's Comments, Marilyn M. Harper, Historian, National Register of Historic Places dated March 18, 1999, attached as Exhibit "18."

    41.    The NPS has demanded that the Plaintiffs vacate their stilted structures, using as a guise the termination provisions contained therein.

14

42.     The NPS first sent an undated letter[5] to the Boat Club stating that the NPS does "not plan to grant lease extensions or renewals in 'Stiltsville'." The letter states that (1) the Campsite Leases are not compatible with the purpose, or the intent, for which Congress created Biscayne National Park, (2) the Leases are not currently acceptable with the NPS' efforts "to protect and enhance the unique ecosystem encompassed in northern Biscayne Bay," (3) "the State of Florida, the former lease administrator, does not *presently* permit nor condone, this type of use in the marine environs it protects,"[6] and (4) extending the Leases "would amount to the lease of government property to private citizens or entities" and "at the *present* time, we do not know of any mandate that would legally permit us to extend the contract and lease government property to private interests."[7] A copy of said letter is attached as Exhibit "19" (emphasis added).

43.     On August 21, 2000, the new Superintendent of Biscayne National Park, Linda Canzanelli, held a press conference. In conjunction with said press conference, the NPS issued a "Media Release on Stiltsville" entitled "Biscayne National Park Announces Stiltsville Plan." A copy of said NPS Stiltsville Media Release is attached as Exhibit "20."

44.     The purpose of the press conference was "to outline plans for Stiltsville's future." *See* NPS Stiltsville Media Release at 1 (first paragraph). The NPS reiterated its continued plan to do away with Stiltsville in its entirety: " The park's ultimate goal is to remove the Stiltsville

---

[5] Based on the fax transmission data at the top of the letter, the letter had to be sent in 1995 at the latest. Upon information and belief, the letter was sent before 1995.

[6] This has changed. *See* ¶ 50, *infra*.

[7] This also has changed. *See* National Park Omnibus Management Act of 1998, Pub. L. 105-391 (Nov. 13, 1998), discussed *infra* at ¶ 51.

15

structures." *Id.* Despite "recognizing that the structures have significance to parts of the south Florida community," the NPS discusses its intention to establish an advisory board "to determine possible uses for structures *until their ultimate removal.*" *Id.* at 1-2 (last paragraph; emphasis added).

45.     On August 21, 2000, at her press conference to which the owners of Stiltsville were expressly invited and some attended including representatives of Plaintiffs, Superintendent Canzanelli stated that eventually there will be a Biscayne National Park without Stiltsville houses. She kept uncertain the exact timing of this plan, indicating that it would be based in large part upon engineering assessments of the houses which the NPS was going to conduct. Superintendent Canzanelli was reiterating the NPS' continued decision and determination to eradicate Stiltsville expressed by NPS Deputy Director Galvin before the House of Representatives Subcommittee on National Parks and Public Lands:

> If the State of Florida renewed the leases on the seven structures, as is likely because of a recent state law extending leases for stilt structures, those holdings would remain indefinitely as structural intrusions into a valuable natural area that Congress intended to be protected, unimpaired, for future generations.

*See* Exhibit "16" at 3 (first full paragraph).

46.     The NPS Stiltsville Media Release also sets forth the first step in the NPS' process to implement its continuing decision to eliminate Stiltsville: "The final [standstill] agreement expires on December 1, 2000, and current users will be required to vacate the campsites on that date." *Id.* at 1 (last paragraph). The Superintendent said the same thing at her press conference, that come December 1, 2000, the owners of the Stiltsville houses will be required to close their doors and walk away because there wasn't going to be any extension beyond December 1, 2000.

16

47.     On November 1, 2000, the USA, through the U.S. Department of Justice, Southern District of Florida, served by certified mail eviction notices to the owners of the Stiltsville homes, ordering that they "must vacate the premises and remove any personal property by November 30, 2000," and adding that "the United States, acting through the Office of the United States Attorney, will initiate legal action against any and all persons who remain in or continue to use the above-referenced property after November 30, 2000." *See, e.g.*, Letter dated November 1, 2000 from Laura W. Bonn, Assistant U.S. Attorney to David Duncan, resident agent for Plaintiff Boat Club, attached as Exhibit "21."

48.     The actions of the NPS in demanding Plaintiffs' vacation of their stilted structures are arbitrary and capricious and without any reasoned basis.  Biscayne National Park was created with Stiltsville already situated within park boundaries.  The language of 16 U.S.C. §410gg-1(a) and the legislative history of that section indicate that Congress' enactment of the Biscayne National Park Act was made recognizing the existence of Stiltsville within the Park.  Indeed, Congress left it up to the State of Florida and *not* the USA to decide the fate of the Stiltsville Campsite Leases by expressly conditioning the donation of this land (and hence the Campsite Leases thereon) to the restrictions and reservations of Florida law.  Furthermore, Stiltsville enhances and protects the marine ecology on the subject flats.  *See* ¶ 53, *infra*.

49.     The actions of the NPS in demanding Plaintiffs' vacation of their stilted structures at lease-end are arbitrary and capricious and without any reasoned basis.  The NPS' Management Plan for Biscayne National Park does not identify any significant environmental impacts or other impacts arising from Stiltsville.

50.     The NPS' action to require vacation of Plaintiffs' structures in Stiltsville is arbitrary and capricious because the NPS is incorrect in its position that the State of Florida will not allow stilted structures to continue existing in the marine environs that it administers. *See* newspaper article from the MIAMI HERALD dated May 16, 1999, and the amendment to 18 Fla. Stat. § 253.03 which amends subsection 7(c) in part as follows: "Structures which are listed in or are eligible for the National Register of Historic Places or the State Inventory of Historic Places *which are over the waters of the State of Florida* and which have a submerged land lease . . . *shall have the right to continue such submerged land leases . . . so long as the lessee maintains the structure in a good state of repair consistent with the guidelines for listing*" (emphasis in original), collectively attached as Exhibit "22."

51.     The NPS' action in requiring vacation of Plaintiffs' structures in Stiltsville is arbitrary and capricious because in 1998 Congress enacted the National Parks Omnibus Parks and Public Lands Management Act of 1998, Pub. L. 105-391, 16 U.S.C. § 1 *et seq.*  Section 802 of that Act allows the Secretary to "enter into a lease with any person or governmental entity for use of buildings and associated property administered by the Secretary as part of the National Park System." If the NPS has not yet promulgated regulations to implement this Act, this fact is sufficient in of itself to grant the injunctive relief requested in this Complaint until such time as the NPS promulgates the implementing regulations and reviews whether to extend the Campsite Leases under the guidelines established in such regulations.  A copy of § 802 of S. 1693, along with a copy of President Clinton's remarks at the time he signed S. 1693 into law, are attached as Exhibit "23."

52.     The NPS apparently is relying on Public Law 105-391 to justify its actions since it previously proposed a Special Use Permit for Lease # 2159A to extend its lease by six months to

18

January 1, 2000. A copy of said proposed Special Use Permit, along with a letter from the Superintendent of Biscayne National Park, is attached as Exhibit "24."

53.  Contrary to the NPS' contentions, Plaintiffs' continued occupation of Stiltsville poses no potential threat to the environment. *See* ¶ 21, *supra*. Indeed, continued existence of the Stiltsville houses likely will <u>prevent</u> damage to Biscayne National Park's flats. *See* Susan Claire Lauredo, Co-Existence: Stiltsville (1998) (unpublished M. Architecture thesis, Florida Int'l Univ.) at 7 ("Many environmentalists also argue that pulling-up of the pylons from the seabed to remove the stilt homes would actually cause more damage than allowing the homes to remain. Without even taking into account their historic significance, we can see that the environmental impacts of these structures are not entirely detrimental, but in fact contribute to the well being of the habitat."), a copy of which page (and other pages cited *infra*) is attached as Exhibit "25;" Carl Hiaasen, *Stiltsville Is Useful*, MIAMI HERALD, June 17, 1999 ("Level the [Stiltsville] houses, and watch what happens to the surrounding fragile flats. Vessel groundings, already a serious problem, are bound to increase. So will scarring damage to the sea grasses, marl banks and tidal cuts."), attached as Exhibit "26." Also, "some of the best fishing in the Bay can be found on the pristine flats surrounding the Stiltsville structures . . . . The shade and protection offered by the very existence of the Stiltsville structures on these flats seem to attract these fish and provide for the quality fishing . . . ." *See* Affidavit of Michael Leech (President of the International Game Fishing Association ("IGFA")) dated June 10, 1999, at ¶ 4, a copy of which is attached as Exhibit "27." The IGFA "has members from approximately 125 countries throughout the world." *Id.* at ¶ 2.

54.  Testimony before the United States Congress this year confirms Stiltsville's continued lack of impact upon the water and that removal of the structures would do more harm than

19

leaving them in place. Dr. Ronald D. Jones, Director and Professor of the Southeast Environmental Research Center and Department of Biological Sciences at Florida International University in Miami, Florida, who is also an IPA from the State of Florida as a Senior Scientist to the United States Corps of Engineers, Jacksonville District, testified:

> [I]t is easily concluded that Stiltsville has no effect on water quality as indicated by the most sensitive analysis we perform . . . , [and] it is concluded that Stiltsville has no negative impacts on the Bay's water quality as indicated by turbidity. I could go through the remaining 15 parameters we measure, but I hope it is sufficient to say that none of these parameters indicate any water quality degradation associated with the presence of Stiltsville.

Dr. Jones also visited Stiltsville shortly before testifying, and he concluded his testimony by stating:

> [I]t is my expert opinion that the presence of Stiltsville in no way negatively affects the water quality or ecology of Biscayne National Park or Biscayne Bay in general. ***Removal of the structures would do more harm than good and therefore Stiltsville should be allowed to remain as is.***

(Emphasis added.)  A copy of Dr. Jones' Testimony before the U.S. House of Representatives Subcommittee on National Parks and Public Lands on May 23, 2000, is attached as Exhibit "28."

55.    Contrary to the NPS' contention, Stiltsville is not a "visual intrusion" or "eyesore" as the NPS arbitrarily declared in the past. "Miami is a unique place in the world. Stiltsville is part of what makes Miami unique. From Key Biscayne you look south out into emerald green waters into our natural heritage, into Stiltsville. Most Miamians know Stiltsville. It is part of the Bay, it is not an eyesore." Exhibit "25" at 24. Rather, Stiltsville is a popular tourist attraction in the State of Florida, is considered by Florida tourism and State governance alike to possess an historic and cultural significance to the State of Florida. The Director of the Dade Heritage Trust ("DHT"), Rebecca Matkov, attests to the significance of Stiltsville to the Miami community:

> In April and May of each year, Miami-Dade County holds what is called "Dade Heritage Days," a two-month-long-celebration of the Miami-Dade County area. During this time, DHT puts on tours of the Stiltsville area, which are consistently sold out and are very popular not only with the tourists to the area but also with residents of the Miami-Dade County area . . . . DHT has had great success with this tour because of the tremendous interest in the Stiltsville community.
>
> DHT recently had the privilege of assisting in the restoration of the Cape Florida Lighthouse located on Key Biscayne in the Biscayne Bay . . . . Tours are regularly provided of this lighthouse and on numerous occasions tourists will climb to the top of the lighthouse to look out over the Bay and immediately notice the Stiltsville community . . . and marvel about their fascination with those stilted structures. Stiltsville enhances the whole experience of those who take this tour and, as the sun sets over the Bay, makes a picturesque vista for all with a view of the Bay.
>
> *       *       *       *
>
> DHT supports the reservation of the Stiltsville community. It has tremendous historic value to the Miami-Dade County area . . . . The stilted structures serve as icons of the years past and enhance everyone's overall experience of the Biscayne Bay and Miami-Dade County area. Those who have experienced Stiltsville usually have a good story to tell their friends and many photographic opportunities as well.

Affidavit of Rebecca Roper Matkov, ¶¶ 4, 5 and 7, attached as Exhibit "29." *See also* the Historical Museum of Southern Florida 2000 Historic Tours with Dr. George Schedule ("on a journey through time in South Florida's historic neighborhoods"); Letter from William D. Talbert, III, acting president and CEO of the Miami Convention & Visitors Bureau to Members of the Historic Preservation Board dated July 28, 1998, stating "Stiltsville has become a point of interest on many tours of Biscayne National Park and Biscayne Bay," all of which are collectively attached as Exhibit "30."

21

56.     Indeed, Stiltsville is considered both as a unique habitat of marine ecology co-existing with human recreational activity and a national historic treasure. *See* Letter from Phillip Everingham, President of the Marine Council, to the Florida National Review Board dated August 10, 1998, attached as Exhibit "31," stating (i) "Over the history of the Marine Council, one of the most unique habitats for both man and nature anywhere has been Stiltsville," (ii) "Stiltsville represents the very best of local marine resources that have been carefully and conscientiously preserved and protected by the lessees," and (iii) "The Marine Council has always supported its [Stiltsville's] existence and strongly endorses its future preservation as a unique national historic treasure. *See also* House of Representatives Special Order by Hon. Ileana Ros–Letinen dated April 13, 1999, stating "According to noted historian Arva Moore Parks, Stiltsville is a 'very fragile piece of history worthy of salvage," attached hereto as Exhibit "32."

57.     Because the Florida Historical Resources Act was enacted after the subject Campsite Leases were executed and donated to the NPS, the State of Florida must consider the historical and cultural aspects of Stiltsville before it can allow the Campsite Leases to terminate.

58.     The State of Florida has already found Stiltsville to be an "historic landmark" and, part of "Old Florida lore and New Florida literature" and a "state treasure." *See* Letter of the Honorable Jeb Bush, Governor of the State of Florida, dated April 17, 1999, and State of Florida House of Representatives House Resolution No. 9217 which "supports the historic significance of Stiltsville as a Miami landmark," copies of which are collectively attached as Exhibit "33."

59.     The City of Miami Commission adopted a resolution on May 11, 1999 "recogniz[ing] the historic significance and contributions Stiltsville has made to Florida," and the Miami-Dade County Historic Preservation Board adopted a resolution on May 4, 1999 "recogniz[ing] the

exceptional historic significance and contributions to Florida" of Stiltsville.   Among other reasons, the City of Miami Commission found that "Stiltsville has [had] profound historical significance" for more than 50 years, Stiltsville is a "well-known Florida landmark symbolizing the old and new Miami," Stiltsville has a "unique design" and "Stiltsville has substantially contributed to South Florida's civic, educational and tourist activities as the remaining seven homes of Stiltsville have been an integral part of the South Florida Historic tours." Similarly, the Miami-Dade County Historic Preservation Board in its *Resolution Recognizing the Significance of Stiltsville to South Florida History,* acknowledged that "Stiltsville has substantially contributed to South Florida's civic, educational and tourist activities," and that "South Floridians have for years depended on the usage of the Stiltsville houses for public and community activities to benefit Miami-Dade County, Florida." Copies of both Resolutions are collectively attached as Exhibit "34." This resolution should not be discarded as self-serving and generated to benefit the Plaintiffs.  Rather, as the Southern Office of the National Trust for Historic Preservation has written to the NPS and the KNR, "the community's strong feelings about the importance of Stiltsville are highly relevant . . . . [T]he National Register is intended, after all, to be a reflection of what communities themselves deem to be historically and culturally significant, even when the objects of public affection are unconventional. * * *  In conclusion, our primary concern is the preservation of Stiltsville as a unique and valued resource." A copy of the correspondence from the  Southern Office of the National Trust for Historic Preservation is attached as Exhibit "35."

60.    The City of Miami Commission also found that "Stiltsville serves as a sanctuary for the sea and plant life ecosystems and has been linked to the ecosystems continuing survival." *See* Exhibit "34" at ¶ 5.

23

61.     Stiltsville also serves vital admiralty navigational and public safety functions. *See* Exhibit "34" (City of Miami Commission Resolution) at pages 1-2 ("Stiltsville homes are used for navigational guidance and shelter during storms by the general boating public"); Exhibit "29" (Affidavit of Rebecca Matkov) at ¶ 6 ("Stiltsville also serves an important role to boaters in the Bay as the stilted structures serve as make-shift 'channel markers' by which boaters and sailors navigate their crafts to stay within the channel and out of the shallows."); and Exhibit "26" (Carl Hiaasen's Column):

> Thank heaven for Stiltsville. That's what I remember thinking during a violent, out-of-nowhere summer storm many years ago. My son and I were huddled in a 14-foot aluminum skiff tied beneath a peeling A-frame house where we had hastily taken refuge. The wind gusted above 50 mph, salt spray lashed our cheeks, and lightning blasted all around.
>
> But we felt safe beneath that old lodge. We couldn't outrun the weather, and it was the only place to hide. That wasn't the first or last time that thunder chased us there.
>
> *          *          *          *
>
> No body of water in North America attracts more certifiable morons in high-powered yachts and speedboats than Biscayne Bay. Most of them don't know the difference between a channel marker and a lobster pot, but they know a double-decker house when they see one looming off their bow.
>
> In that way Stiltsville has become a useful landmark for boaters trying to navigate the winding finger channels in the eastern bay. Level the houses, and watch what happens to the surrounding fragile flats.

*See also* Letter from Michaeleen Burns dated August 12, 1998 ("On a recent sailing venture, I along with some friends were caught in a terrible storm and could not see any of the navigational markers located in our waters due to the weather conditions. Fortunately for us, the remaining 'Stiltsville'

24

structures were visible which gave us some navigational guidance to get out of the storm."); Letter

from Rob Killgore dated August 27, 1998 ("This is not the only time a Stiltsville structure saved us.

Once my son, Capt. Rick Killgore, and I had to seek safety under the 'A' frame during a squall that

was clocked with winds of 55 mph."); and Letter from Carl Colbert dated August 11, 1998 (using

Stiltsville homes for navigation landmark for 34 years), which letters are attached as Exhibit "36;"

and Exhibit "38," an article in the Jan-Feb, 1987 edition of *Scouting* at 44 ("An hour after arrival,

the skies grew dark, the air blew cold, the wind picked up, and soon a sheet of rain could be seen

advancing toward the house from across the water to the east. A bone-fisherman guided his shallow

skiff to refuge under the home. Another boat with three fishermen, sensing failure of their efforts

to outrace the storm, tied up at the dock and were given permission to come inside.").

      62.    Plaintiffs have also extended Stiltsville houses for public service and/or use. As

William O. Cullom, President of the Greater Miami Chamber of Commerce, wrote to the MIAMI

HERALD and which newspaper published on April 6, 1999:

> The owners of Stiltsville have shared its beauty and solitude with
> youth, church and community groups, environmentalists and visiting
> dignitaries. Stiltsville is too important to lose. We must protect those
> community assets that individually as well as collectively make
> Miami the truly magic city that it is.

A copy of the published letter is attached as Exhibit "37." There follow comments and thank-yous

that have been expressed by some of the organizations that have used the Stiltsville houses:

> Over the past years the Miami Springs Power Boat Club has provided
> many occasions for our patients to take off station excursions with
> them. These have been in the form of Fish Fries, Steak Fries, etc.
> The club has taken patients on New Years Eve boat trips.

(Letter dated September 7, 2000 from George D. Frye, Department of Veteran Affairs);

> Dade Heritage Trust is very pleased to accept your offer to host four events at Stiltsville during 2001.
>
> *      *      *
>
> We believe that maintaining the houses at Stiltsville and ensuring public access to the properties . . . support and enrich the cultural heritage of Miami-Dade County.

(Letter dated October 23, 2000 from Rebecca Roper Matkow, Executive Director, Dade Heritage

Trust);

> I would like to thank you for taking our troop out to spend the day at Stiltsville. . . . They actually got an education on environmental issues without even knowing it. . . . It is very upsetting to find out that they may not have the opportunity again because of the legal entanglements with the parks department.

(Letter undated from Barbara Tucker, Girl Scout Leader, Troop 520);

> On behalf of the Boy Scouts and the families of Troop 941, please allow me to thank you for the numerous opportunities that we have had to visit the Stiltsville houses in Biscayne Bay. . . . Your sponsored visits have provided us with many occasions to learn more about Miami's history, ecology and environment. . . . You provide an invaluable asset to the community and the Scouting program in South Florida.

(Letter dated August 27, 2000 from Barry Schwartzman, Scoutmaster, Troop 941);

> The latest decision by the Park service would certainly have an adverse impact on the youth of our community. . . . Your program of hosting 'Scout Days' at the house has provided the youth of our community several opportunities that they would not otherwise have had. . . . [O]ur Scouts would not have had an opportunity to learn the history of the area nor would they have experienced first hand the atmosphere of the setting. I don't believe that there is any other place like it, certainly not in the Miami area, so it is truly a unique, one-of-a kind experience.

(Letter dated August 23, 2000 from Robert Wilkes, Jr., Assistant Scoutmaster, BSA Troop 10);

> I grew up in Miami and can remember seeing Stiltsville out in the bay. I always wanted to go out there and as a youth minister I wanted to bring a group. . . . Every kid [more than 40] who attended this event had a great time and went away with a new appreciation for nature. How can this be bad for the environment? It will be a shame if my group is the last to enjoy the beauty of Stiltsville

(Letter in the READER'S FORUM from Irwin Podhajser, Director of Youth Ministry). Copies of the quoted letters, as well as the article in *Scouting* magazine in <u>1987</u> and several other letters, are collectively attached as Exhibit "38."

63.     Plaintiff Boat Club has signed, and Plaintiff Slayden is prepared to sign if necessary, a *Proposal To The National Park Service To Preserve Stiltsville For Public And Community Use At Expense Of Owners*, which Proposal includes indemnifying and holding harmless the NPS "with regard to any incident or accident involving personal injury or property damage at [the] Stiltsville structure[s]" and maintaining a liability insurance policy of at least $1,000,000.00 with the NPS named as an additional insured. A copy of said Proposal from Plaintiff Boat Club is attached as Exhibit "39."

### III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Injunctive Relief — All Defendants)

64.     Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

65.     The management interest in Plaintiffs' Campsite Leases held by the NPS does not provide the USA with the right to evict the Plaintiffs from submerged lands on December 1, 2000.

66.     Under the Biscayne National Park Act, the Campsite Leases, and their renewal, are subject to Florida law and the reservations and restrictions provided thereby. *See, e.g.,* Letter from

27

Senator Bob Graham dated May 24, 1994, in which he advises Plaintiff Miami Springs Power Boat Club: "Thank you for sending me a courtesy copy of the letter you originally sent to the Division of State Lands regarding your request to extend the lease for the Stilts House located in Biscayne Bay. Although I understand your concerns, *this is a matter in which the state has primary jurisdiction*." (Emphasis added.) A copy of Senator Graham's letter is attached as Exhibit "40."

67. The Campsite Leases are by and between the State of Florida *ex rel.* the Florida Trust Fund and the Plaintiffs and provide:

> Lessee agrees that, automatically upon the termination of this lease..., all rights of Lessee to the use, occupancy and possession of said land shall close and terminate. *The stilt houses and all improvements will be removed*, by and at the owner's expense, *unless otherwise agreed to....*

*See* Exhibit "4" at ¶ 18 (emphasis added). Thus, the Campsite Leases, combined with the Biscayne National Park Act, provide the Florida Trust Fund, *i.e.* the State of Florida, and in particular its executive agency, with the *exclusive* option to renew the Campsite Leases or recognize and enforce their termination at its sole discretion.

68. To allow the USA through the NPS, or otherwise, to determine whether the Campsite Leases will be renewed or extended or whether Plaintiffs should be evicted from their stilt structures under the State-owned Campsite Leases not only contravenes the very purpose and express language of the Campsite Leases, but it also contravenes (i) Dedication No. 26383 (3365-13) by which the NPS obtained the land upon which Stiltsville rests, (ii) the public interest of the State of Florida in the statutorily mandated preservation of these historically and culturally significant structures and (iii) the Biscayne National Park Act, 16 U.S.C. § 410gg-1(a), and it undeniably subjects Plaintiffs to substantial hardship.

69.     The NPS' determination of such an issue would subject Plaintiffs to substantial hardship by arbitrarily taking their stilt structures and bear the financial burden of not being compensated without effectively providing Plaintiffs with the possibility of renewal as written in their Campsite Leases and as allowed under the National Park Omnibus Management Act of 1998.

70.     Such NPS action would also fail to comply with the Dedication's requirement that the USA, DOI and NPS must "take steps to . . . protect, and preserve the . . . cultural, and historical features for the use and enjoyment of present and future generations...."  Therefore, pursuant to condition no. 6 of the Dedication, the automatic reverter clause, the land upon which the Campsite Leases are located would automatically revert back to the Florida Trust Fund because the land is not being utilized "to protect and preserve . . . cultural and historical features."

71.     The NPS' action on this issue would also contravene the public interest of the State of Florida which has recognized, through many facets of Florida tourism and governance, the historical and cultural significance of Stiltsville to the State of Florida, the City of Miami, the Biscayne National Park and the public in general.

72.     The NPS' actions would further contravene Florida public interest by: (i) in effect abrogating the Florida Historical Resources Act, 18 Fla. Stat. §§ 267.011 *et seq.* (enacted after the Campsite Leases were entered into) which sets forth public policy of the State of Florida to protect, preserve and administer all state-owned sovereignty submerged lands and non-state-owned historic resources, and (ii) usurping and destroying these historically and culturally significant structures attributable to the State of Florida.

73.     The USA, the DOI, the Secretary, the NPS and Director should be enjoined, temporarily and permanently, from enforcing the termination provisions of the Campsite Leases and

from evicting the Plaintiffs under those Campsite Leases until such time that the State of Florida or

the Florida Trust Fund considers whether to extend or renew the Campsite Leases and decides not

to extend or renew the Campsite Leases.

74.     The State of Florida should be enjoined, temporarily and permanently, from allowing

the Campsite Leases to terminate without further review because to do so would contravene the

Florida Historical Resources Act, 18 Fla. Stat. §§ 267.011, et seq., enacted after the Campsite Leases

were enacted.   Thus, the State of Florida has not yet performed the required statutory review,

particularly in light of the facts that Stiltsville has already been found to be of historical and cultural

value and that the termination of the Campsite Leases will result in their "demolition and loss

forever."

75.     As demonstrated in ¶¶ 15-18, 23-28 and 66-72, supra, under the applicable statutes

and Dedication of the State of Florida encompassing Stiltsville and the Campsite Leases, there is a

substantial likelihood that Plaintiffs will prevail on the merits.

76.     Unless this injunctive relief is granted, Plaintiffs will suffer immediate and irreparable

harm, loss and damage including but not limited to the termination of their leasehold interests and

cessation of use through the ultimate destruction of their Stiltsville structures and along with that

destruction and termination of their use and enjoyment of valuable, historical and cultural landmarks

to the State of Florida.   In addition, the public will suffer immediate and irreparable harm if

Stiltsville is demolished.  "If Stiltsville were to be demolished, structures with such use, beauty and

rich architectural design could never be replicated, and this special opportunity for individuals to

visit such a rare landmark would be lost to future generations."   Letter of the Honorable Ileana

Ros-Letinen, Lincoln Diaz-Balart, Carrie Meek, Alcee Hastings and E. Clay Shaw, Jr., members of

Congress, to Secretary of the Interior Bruce Babbitt dated April 15, 1999, attached as Exhibit "41." ("Preservation of the Stiltsville homes (with their current owners) will not only maintain the aesthetic beauty of the region and continue to benefit the local wildlife, but also will continue Stiltsville's substantial contribution to South Florida's civic, educational and tourist activities."); *see also* Letter of Arva Moore Parks to The Dade County Historic Preservation Board ("Your designating 'Stiltsville' as an historic site will help insure its survival as a truly unique piece of South Florida our [sic] past. If it is torn down, it cannot be replicated or replaced and therefore will be yet another lost resource."), a copy of which is included in Exhibit "42."

77.    As is evident from the Management Plan, the existence of Stiltsville presents no threatened harm to Biscayne National Park. *See* ¶ 21, *supra*. Thus the threatened injury to the Plaintiffs unquestionably far outweighs any threatened harm to the Defendants. *See also* Dr. Jones' Testimony at ¶ 54, *supra* and Exhibit "28."

78.    Granting Plaintiffs' requested injunctive relief will not disserve the public interest. Indeed, the opposite is the case; the public interest will be served. *See* Letter from Jane Lanahan of Miami dated July 23, 1998 (Seeing Stiltsville on a day cruise shortly after her mother died when she was six "made me realize that my mother was in a happier place now . . . . But think how great it would be, in times of great advancement and technology, to preserve something so modestly eclectic and surreally natural. When greater skylines emerge in Miami out of pieces of steel and synthetic fibers made in laboratories, the wood framed houses of Stiltsville would remind us of our humble existence, our relationship with the ocean, and our respect for preservation."); Letter from Gus Martinez of Miami dated July 7, 1998 (Upon arriving from Cuba in 1993 Stiltsville was one of the first places my family and I were taken and "I fell in love with this place immediately."); Letter from

31

Edward Snow, Jr. of Coral Gables dated August 24, 1998 ("In addition to its functional purposes [hosting functions sponsored by various organizations in Dade County], Stiltsville remains one of Dade County's most beautiful, enjoyable, and unique attractions. It is an irreplaceable part of the Miami skyline."); Letter from Dr. Lester Standiford, Director of Creative Writing Program, Florida International University, dated August 12, 1998 ("[W]e simply lack the wisdom and authority to decide what future generations will find valuable or marvelous. No one who chances upon the phenomenon of Stiltsville for the first time will ever forget the sight of homes that hover above the waters, miles from any shore, like structures from a dream."); Letter from Ron Shuffield of the Greater Miami Chamber of Commerce dated June 23, 1998 (cruise of Biscayne Bay as part of orientation of executives new to Miami and results in them being "definitely sold" on Miami); Letter from Jeff Mark of the FedEx Orange Bowl dated January 29, 1998 ("Once again, the [FedEx Orange Bowl Coaches] Stiltsville outing was one of the most talked-about events during bowl week."); Letter from residents of Dubrovnik, Croatia, dated July 20, 1998 (After observing that the historic buildings in Dubrovnik were destroyed during the Bosnian War, "[w]e can't understand that in USA free country enjoying peace and prosperity somebody is going to destroy Stiltsville. The 'Miami Vice' put Miami on world map and Stiltsville is something everybody remembers as a unique site from Miami."); Letter from Gerd and Gertraud Troyke of Germany dated July 11, 1998 ("[T]he absolute best was the time we could spend in Stiltsville, your house on the ocean . . . . We've traveled a lot all around Europe, Russia, etc., but we've never experienced a place that magical."); Letter from Sean Donovan of Brooklyn, New York, dated July 29, 1998 ("Why should a whole lot of money be spent to tear down what causes no harm, yet brings so much joy?"). Copies of these

letters, plus others, are collectively attached as Exhibit "43." *See also* ¶¶ 55, 56 and 59-63, *supra*, and ¶ 97, *infra*.

79.     Plaintiffs are without any adequate remedy at law and thus will suffer irreparable harm if the Defendants are not enjoined. Plaintiffs will likely prevail on the merits in this action. Plaintiffs request that no bond be required of them due to the fact that the temporary injunctive relief as requested by this Complaint would merely temporarily prevent enforcement of the termination provisions of the Campsite Leases and would pose <u>no</u> pecuniary or other harm to the State of Florida, the NPS and its Director, the DOI and its Secretary or the USA.

80.     The undersigned certifies, pursuant to Fed.R.Civ.P. 65(b), that on the morning of November 28, 2000, notice of Plaintiffs' intention to seek temporary injunctive relief in this matter at approximately 9:00 a.m. on November 29, 2000, was provided to each of the Defendants by transmitting a copy of the Complaint (*sans* the two Appendices hereto, due to their volume) *via* facsimile to the following:

>     (a)     Defendant USA, by and through Guy A. Lewis, Esq. and Laura W. Bonn, Esq., Office of the United States Attorney for the Southern District of Florida at (305) 530–7679;

>     (b)     Defendants DOI and its Secretary, by and through Bruce Babbitt, Secretary of the Interior at (202) 208–5048;

>     (c)     Defendants NPS and its Director, by and through (i) Robert Stanton, its Director at (202) 219–0910; (ii) Jerry Belson, Regional Director of the Southeast Area Office of the NPS at (404) 562–3263; and (iii) Linda Canzanelli, Superintendent of Biscayne National Park at (305) 230–1190; and

(d)     Defendants State of Florida and the Florida Trust Fund, by and through the office of Jeb Bush, Governor of the State of Florida at (850) 487–0801.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment — All Defendants)

81.     Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

82.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to judgment declaring the following:

(a)     The State of Florida may extend or renew the Campsite Leases with Plaintiffs and is the only party who may enforce the provisions of those Campsite Leases and/or decide to evict Plaintiffs from their stilt structures.

(b)     If the State of Florida extends or renews the Campsite Leases with Plaintiffs, the USA, the DOI and its Secretary, and the NPS and its Director must abide by such decision and continue to manage the Biscayne National Park and the Campsite Leases for the new lease term set.

(c)     The NPS has demonstrated extreme bias against the Plaintiffs, the Campsite Leases and the entire concept of "Stiltsville" as evidenced by its arbitrary and capricious actions, including its adverse recommendations to KNR on Stiltsville's nomination for inclusion in the National Register of Historical Places after representing to Plaintiffs that it would take no position on the nomination.

(d)     To the extent the State of Florida is found *not* to be the proper party to determine whether to extend or renew the Campsite Leases with Plaintiffs, and the

34

NPS is determined to be that proper party, the NPS' extreme bias against Plaintiffs (as evidenced by its decision in 1983 to terminate the Campsite Leases, even though no environmental impact or harm had been identified, by the NPS' Associate Director, Cultural Resource Stewardship and Partnership, and the Southeast Regional Office recommendations that Stiltsville not be included in the National Register of Historic Places) disqualifies it and the DOI from making such a determination, and this determination should be left to the Court,[8] and by NPS Deputy Director Galvin's testimony to the House of Representatives Subcommittee on National Parks and Public Lands evidencing NPS' interpretation of Congress' intent with respect to the statute creating Biscayne National Park: If the Stiltsville structures remain, "those holdings would remain indefinitely as structural intrusions into a valuable natural area that Congress intended to be protected, unimpaired for future generations." *See* Exhibit "16" at 3 (first full paragraph).

(e)     That during the pendency of any injunctive relief granted by this Court, Plaintiffs be allowed to continue to reside in and use the structures on the Campsite Leases for their recreational uses, enjoyment and community service uses and in order to maintain same and protect the cultural and historical resources and values thereon against vandalism and destruction (other than by natural forces).

---

[8]   The NPS' prejudice is demonstrated in its handling and undue negative influence imparted with respect to the nomination to include Stiltsville in the National Register of Historic Places, which is detailed in APPENDIX II.

35

## THIRD CLAIM FOR RELIEF
## (Mandamus — State of Florida and Florida Trust Fund)

83.     Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

84.     The State of Florida through the Florida Trust Fund is the only party which may determine whether to renew or extend the terms of the Campsite Leases with Plaintiffs or to acquiesce in and enforce the termination of those Campsite Leases.

85.     The State of Florida and the Florida Trust Fund should be commanded by the Court to determine whether to renew or extend the terms of the Campsite Leases with Plaintiffs.

86.     The State of Florida and the Florida Trust Fund should be commanded by the Court to conduct its statutorily required review under the Florida Historical Resources Act, 18 Fla. Stat. §§ 267.011-267.0612, before it determines whether to renew or extend the terms of the Campsite Leases with Plaintiffs.

87.     During the period of time in which the State of Florida and the Florida Trust Fund are given to make such determinations, the termination provision of the Campsite Leases should be stayed and the Campsite Leases judicially extended to maintain the *status quo* and prevent irreparable harm to Plaintiffs until such a determination is reached.

88.     During the period of time in which the State of Florida and the Florida Trust Fund are given to make such determinations, Plaintiffs should be allowed to continue to reside in and use the structures on the Campsite Leases for their recreational uses, enjoyment and community service uses and in order to maintain same and protect the cultural and historical resources and values thereon against vandalism and destruction (other than by natural forces).

## FOURTH CLAIM FOR RELIEF
### (Injunctive Relief/Mandamus — All Defendants)

89.    Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

90.    If the Court finds the State of Florida possesses the exclusive right to determine whether to extend or renew the Campsite Leases with Plaintiffs, the NPS and its Director, the DOI and its Secretary, and the USA should be restrained, temporarily, from enforcing the termination provisions of the Campsite Leases against Plaintiffs until the State of Florida makes such a determination and unless the State of Florida determines *not* to extend or renew the Campsite Leases with Plaintiffs.

91.    The NPS has proposed a four-step process to eliminate Stiltsville from Biscayne National Park: (1) evict the Plaintiffs and the other residents of the Stiltsville homes; (2) conduct engineering inspections of the Stiltsville houses; (3) determine if the Stiltsville structures are safe to allow public use for a period of time; and (4) remove the Stiltsville structures, thereby eliminating Stiltsville's existence forever.

92.    The NPS has engaged in the first three steps, and only has the final step left.  First, the USA has given Plaintiffs eviction notices effective December 1, 2000.  *See* ¶ 47, *supra* and Exhibit "21."

93.    Second, the NPS has also conducted the engineering inspections.  Third, while the NPS has not provided Plaintiffs with the actual engineering reports, it has sent identical letters to Plaintiffs advising of "latent defects."  Copies of the letters are collectively attached as Exhibit "44." It is expected that the NPS will use the existence of alleged defects in the structures to skip the "public use" part of Superintendent Canzanelli's plan set forth in her August 21, 2000 press conference and the NPS Stiltsville Media Statement so that it can immediately proceed to the fourth

and final step: removal and elimination of Stiltsville. *See also* NPS Media Release dated November 17, 2000 entitled "Public Safety Is a Priority at Stiltsville Structures" in which Superintendent Linda Canzanelli, despite not having yet received the actual engineering reports, states: "We are urging everyone please not to use the structures;" and the article in the MIAMI HERALD of November 21, 2000, reporting on the NPS' Media Release, copies of both of which are also included in Exhibit "44."

94.    To date, the NPS has not made available to the public any proposed plan to implement its proposal for Stiltsville. Likewise, the NPS and DOI have not made available to the public for comment any draft environmental assessment setting forth the potential impacts from its plan to remove the structures and eliminate Stiltsville.

95.    If the Court finds the State of Florida possesses the exclusive right to determine whether to extend or renew Plaintiffs' Campsite Leases and the State of Florida determines not to extend or renew the Campsite Leases with Plaintiffs, or if the Court finds that the State of Florida does not possess the exclusive right to determine whether to extend or renew the Campsite Leases with Plaintiffs, the NPS and its Director, the DOI and its Secretary, the USA, the State of Florida and the Florida Trust Fund should each be enjoined, temporarily, from enforcing the termination provisions of the Campsite Leases against Plaintiffs until such time as the NPS has prepared a draft plan and draft environmental assessment covering its four-step plan for Stiltsville and made said plan available for public comment and thereafter issues a final plan.

96.    As is evident from the previous Management Plan, the existence of Stiltsville presents no threatened harm to Biscayne National Park. *See* ¶ 21, *supra*; *see also* Dr. Jones' Testimony to Congress, ¶ 54, *supra* and Exhibit "28." Thus the threatened injury to the Plaintiffs unquestionably far outweighs any threatened harm to the Defendants.

97.     Granting Plaintiffs' requested injunctive relief will not disserve the public interest. Indeed, the opposite is the case; the public interest to preserve a cultural and historical landmark will be served. The Southern Office of the National Trust for Historic Preservation has stated that even if the existing structures only go back to the 1960s, "Stiltsville" reflects Miami's history back to the 1930s and the public demands that it be preserved:

> Stiltsville's history is a colorful one, dating back to the 1930s, and reflecting Miami's cultural identity as a mecca for recreation and entertainment. As evidence that Stiltsville's historic and cultural significance extend well beyond the 1960s fabric of the remaining structures, the potential loss of Stiltsville has generated an outpouring of community support for its protection. Petitions with thousands of signatures, opinions from prominent local historians, . . . all implore the National NPS to recognize and protect this unique site. In a community as culturally diverse as Miami and Dade County, the breadth of public support for protecting this resource is all the more impressive.

Exhibit "35" at 2; *see also* ¶¶ 55-59 and 78, *supra*; Exhibit "42." Moreover, thousands of Floridians have signed petitions to save Stiltsville. *See* Exhibit "34," Miami-Dade Historic Preservation Board Resolution at 2 ("in only about the last two weeks, thousands of signatures were gathered on petitions to 'Save Old Stiltsville.').[9]

98.     If the Court does not grant Plaintiffs the injunctive relief sought under their First Claim for Relief nor their Fourth Claim for Relief, Plaintiffs are without any adequate remedy at law and will prevail on the merits in their appeal. Plaintiffs request that no bond be required of them due to the fact that the injunctive relief as requested by this Complaint would merely temporarily prevent enforcement of the termination provisions of the Campsite Leases and would pose no pecuniary or other harm to the NPS, the DOI or the USA.

---

[9]   Plaintiffs have the signed petitions which will be produced at trial or hearing, and which can be produced at this time if the Court so desires.

99.     The undersigned again certifies, pursuant to Rule 65(b), that on the morning of November 28, 2000, notice of Plaintiffs' intention to seek temporary injunctive relief in this matter at approximately 9:00 a.m. on November 29, 2000, was provided to each of the Defendants by faxing a copy of the Complaint (*sans* the two Appendices hereto, due to their volume) to the following:

(a)     Defendant USA, by and through Guy A. Lewis, Esq. and Laura W. Bonn, Esq., Office of the United States Attorney for the Southern District of Florida at (305) 530–7679;

(b)     Defendants DOI and its Secretary, by and through Bruce Babbitt, Secretary of the Interior at (202) 208–5048;

(c)     Defendants NPS and its Director, by and through (i) Robert Stanton, its Director at (202) 219–0910; (ii) Jerry Belson, Regional Director of the Southeast Area Office of the NPS at (404) 562–3263; and (iii) Linda Canzanelli, Superintendent of Biscayne National Park at (305) 230–1190; and

(d)     Defendants State of Florida and the Florida Trust Fund, by and through the office of Jeb Bush, Governor of the State of Florida at (850) 487–0801.

## FIFTH CLAIM FOR RELIEF
### (Injunctive Relief — USA, NPS and its Director, DOI and its Secretary)

100.    Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

101.    The NPS and the DOI, by and through the USA, have provided notice to Plaintiffs and the other residents of the Stiltsville structures that an "engineering report" it has purportedly

obtained will reflect "latent defects" in those structures which will form the basis upon which the NPS will forego public use of those structures.

102.    The NPS, the DOI and/or the USA have recently formulated a four-step plan which encompasses the demolition of Plaintiffs' structures as well as the other remaining Stiltsville structures and thus the elimination of Stiltsville forever (the "Demolition Plan"): (1) evict Plaintiffs; (2) conduct engineering inspections of the structures; (3) depending upon the engineering reports, allow temporary public use of the structures; and (4) remove the structures and thereby end the existence of Stiltsville.

103.    The NPS' 1983 General Management Plan, Development Concept Plan, Wilderness Study and Environmental Assessment for Biscayne National Park do not discuss the alternative of the NPS to temporarily own, operate, maintain and make available for public use Plaintiffs' Stiltsville structures.

104.    In the NPS Stiltsville Media Release, the NPS is suddenly maintaining that "[s]eagrass meadows here are lush, and may contain the federally endangered Johnson's seagrass" and implying that shadows from the Stiltsville structures "inhibit[] seagrass growth." *See* Exhibit "20" at 1 (third paragraph).

105.    Removal of the Stiltsville structures, however, will likely *damage* the Biscayne National Park environment and ecosystem. *See* Dr. Jones' testimony, Exhibit "28" at 2 (last paragraph ("Removal of the structures would do more harm than good and therefore Stiltsville should be allowed to remain as is"); Susan Claire Lauredo study, Exhibit "25" at 7 ("Many environmentalists also argue that pulling up of the pylons from the seabed to remove the stilt homes would actually cause more damage than allowing the homes to remain").

106.    Neither the NPS nor the DOI nor the USA has made available to the public for review and comment any draft of the Demolition Plan, and thus going forward with the Demolition Plan or any similar plan would violate the Administrative Procedures Act, 5 U.S.C. §§ 500 *et seq.* ("APA").

107.    Further, neither the NPS, nor the DOI nor the USA has made available for review and public comment either a draft Environmental Impact Statement or Environmental Assessment discussing the impacts from the Demolition Plan or alternatives to it as required by the National Environmental Policy Act of 1969 ("NEPA") and regulations promulgated in accordance therewith, such as 16 C.F.R. § 1.82.

108.    In the event this Court determines that the USA, the DOI and/or the NPS, rather than the State of Florida, is to decide the status of Plaintiffs' Campsite Leases and the fate of Stiltsville, until the NPS and its Director, the DOI and its Secretary and the USA have complied with the APA and NEPA, they should each be enjoined from terminating the Plaintiffs' Campsite Leases, evicting Plaintiffs and implementing their Demolition Plan to eliminate Stiltsville.

109.    Plaintiffs are without any adequate remedy at law and thus will suffer irreparable harm if these federal Defendants are not enjoined.  Plaintiffs will likely prevail on the merits of this action.  Plaintiffs request that no bond be required of them due to the fact that the temporary injunctive relief as requested by this Complaint would merely temporarily prevent enforcement of the Campsite Leases, require the NPS, the DOI and the USA to comply with the APA and NEPA and would pose no pecuniary or other harm to the NPS, the DOI and the USA.

110.    Plaintiffs incorporate the notice steps set forth in ¶¶ 79 and 99, *supra*, as if fully restated in this Paragraph.

## SIXTH CLAIM FOR RELIEF
### (Unconstitutional Taking — NPS, DOI and USA)

111.    Plaintiffs incorporate each allegation made in each of the preceding paragraphs contained in this Complaint as if fully set forth herein.

112.    At her press conference, Superintendent Canzanelli stated that in addition to taking Plaintiffs' Stiltsville structures and removing them, there would be no compensation to the Plaintiffs because the structures are not owned by the current users and because the leases amortized the value of the structures to $0.00 as of 1999, and therefore they were of no value.

113.    The Miami-Dade Tax Collector has valued the Boat Club for *ad valorem* taxes.  A copy of the Combined Tax Notice for year 2000 is attached as Exhibit "45."

114.    Alternatively, in the event the Court finds that it cannot grant any of Plaintiffs' claims for relief requested above, the plans of the NPS, the DOI and the USA to confiscate Plaintiffs' respective Campsite Leases and the improvements thereon (which Plaintiffs independently own) for future public use without compensation to Plaintiffs is an unconstitutional taking of Plaintiffs' property without just compensation, contrary to the mandates of the Fifth Amendment to the United States Constitution and the Florida Constitution.

115.    Additionally, the plans of the NPS, the DOI and the USA to confiscate Plaintiffs' respective Campsite Leases and the improvements thereon (owned by Plaintiffs) with the ultimate purpose of destroying those improvements without compensation to Plaintiffs is an unconstitutional condemnation of Plaintiffs' property without just compensation, also contrary to the mandates of the Fifth Amendment to the United States Constitution and the Florida Constitution.

116.    Plaintiffs demand a trial by jury to determine the amount of compensation to which they are entitled for the federal government's condemnation and/or taking of their respective properties for public use, as described above.

## IV.  CONCLUSION

WHEREFORE, Plaintiffs pray the Court will grant the relief requested herein above under their First through Fifth Claims for Relief, or alternatively, if the Court first finds it is unable to grant any of such requested relief, that it grant them the relief sought by their Sixth Claim for Relief, and that it grant them such other and further relief, including reasonable costs and attorneys' fees under the Declaratory Judgment Act, 28 U.S.C. § 2412 and as otherwise provided by law, as the Court may deem to be just and proper.

Respectfully submitted:

Thomas J. Caldwell, Esq.
Michael R. Jenks, Esq.
WALTON LANTAFF SCHROEDER & CARSON
9350 Financial Centre - 10th Floor
9350 South Dixie Highway
Miami, Florida 33156
Telephone:  (305) 671-1300
Facsimile: (305) 670-7065

OF COUNSEL:
Randolph L. Jones, Jr., Esq.
David H. Herrold, Esq.
*admissions pro hac vice filed*
CONNER & WINTERS,
A Professional Corporation
3700 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103-4344
Telephone:  (918) 586-8955
Facsimile:  (918) 586-8547

Attorneys for the Plaintiffs,
MIAMI SPRINGS POWER BOAT CLUB INC. and
PAUL J. SLAYDEN

44

## VERIFICATION

STATE OF OKLAHOMA      )
                                             ) ss.
TULSA COUNTY             )


     Randolph L. Jones, Jr., of lawful age and being first duly sworn, upon oath deposes and states that he is one of the attorneys representing the named Plaintiffs in the above-entitled action and that he has personally reviewed the contents and statements of the foregoing Complaint, and that those statements and contents are true and correct to the best of his knowledge, information and belief.


_____
RANDOLPH L. JONES, JR.

SUBSCRIBED AND SWORN to before me, the undersigned notary public, this 27th day

of November, 2000.


_____
Notary Public

My commission expires: _June 26, 2002_

## VERIFICATION

STATE OF FLORIDA      )
                           ) ss.
MIAMI-DADE COUNTY   )

       Thomas J. Caldwell, of lawful age and being first duly sworn, upon oath deposes and states that he is one of the attorneys representing the named Plaintiffs in the above-entitled action and that he has personally reviewed the contents and statements of the foregoing Complaint, and that those statements and contents are true and correct to the best of his knowledge, information and belief.

                                       THOMAS J. CALDWELL

       SUBSCRIBED AND SWORN to before me, the undersigned notary public, this 27 day of November, 2000.

                                         Notary Public

My commission expires:_____

NOTARY PUBLIC - STATE OF FLORIDA
KAREN S. WARSHAW
COMMISSION # CC629596
EXPIRES 5/15/2001
BONDED THRU ASA 1-888-NOTARY

46

JS 44

# CIVIL COVER SHEET

Case 1:00-cv-04518-KMM Document 1 Entered on FLSD Docket 11/30/2000 Page 47 of 47

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

00-4518 CIV-MOORE
MAGISTRATE JUDGE O'SULLIVAN

**I. (a) PLAINTIFFS** MIAMI SPRINGS POWER BOAT CLUB, INC., and PAUL J. SLAYDON

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Miami-Dade County, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

A-dade/oocv 4518 (Moore) O'sullivan

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michael R. Jenks, WALTON LANTAFF SCHROEDER & CARSON, 9350 South Dixie Highway, 10th Floor, Miami, FL 33156 (305) 671-1300, (305 670-7065 fax; Randolph L. Jones, Jr., and David H. Herrold, CONNER & WINTERS, 15 East Fifth Street, Ste. 3700, Tulsa, Oklahoma 74103-4344, (918) 586-5711; (918) 586-8547 fax

**DEFENDANTS** UNITED STATES OF AMERICA, THE DEPARTMENT OF THE INTERIOR; THE SECRETARY OF THE INTERIOR; THE NATIONAL PARK SERVICE; THE DIRECTOR OF THE NATIONAL PARK SERVICE, THE STATE OF FLORIDA; THE FLORIDA BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND; and THE GOVERNOR OF THE STATE OF FLORIDA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITION** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7809 | ☐ 960 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | | ☒ 990 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | |
| ☐ 290 All Other Real Property | | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) Action for injunctive, declaratory and mandamus relief against the Defendants to prevent them from enforcing termination provisions of "Campsite Leases" held by Plaintiffs on their residences located in Biscayne Bay and within the Biscayne National Park, due to the cultural and historical significance of these residences. 16 U.S.C. §§ 410gg-1 et seq. and §§ 470 et seq., 28 U.S.C. §§ 2201

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23
**DEMAND $** *undetermined* CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

## VIII. REQUESTED CASE(S) (See instructions):
IF ANY JUDGE _____ DOCKET NUMBER _____

DATE _____ SIGNATURE OF ATTORNEY OF RECORD _____
$150.00 832279

FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE 11/29/00